RENDERED: JUNE 20, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0743-MR

FAYETTE COUNTY BOARD OF
EDUCATION                                                          APPELLANT

v.
APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JULIE M. GOODMAN, JUDGE
ACTION NO. 18-CI-01569

KELVIN BRUCE MITCHELL                                             APPELLEE

OPINION
REVERSING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND CALDWELL, JUDGES.

ACREE, JUDGE: Fayette County Board of Education (FCBE) appeals a judgment

after jury trial for Kelvin Bruce Mitchell on his race discrimination claim. FCBE

argues the trial court erred by denying its motion for directed verdict. FCBE also

argues abuses of discretion regarding evidentiary rulings were so numerous and

substantive as to require reversal. We find merit in both arguments and reverse.

## RELEVANT BACKGROUND

Mitchell, an African American, was born in 1963 and attended primary and secondary school in rural Kentucky. He was a talented athlete. Teachers advanced him from grade to grade despite his inability to read or write at grade level. He received a high school diploma and attended Eastern Kentucky University for two years on an athletic scholarship. He still cannot read or write.

Mitchell entered the workforce as a physical laborer. Fellow Harlan Countian, Dr. P. G. Peeples, secured him a custodial position (Grade 10) in the Fayette County Public Schools (FCPS) at the high school where he was principal.

Years later, in 2015, Mitchell and five Caucasian men interviewed for two FCPS vacancies: a Grounds Worker I (Grade 12) position and a Grounds Worker II (Grade 14) position. Both required an "ability to . . . communicate effectively both orally and in writing." The Grade 14 position also required a "Valid Kentucky Commercial Driver's License (Class B)," hereafter CDL.

Although Mitchell could satisfy neither requirement, he was awarded the higher position. Scott Hatton, one of Mitchell's eventual co-workers and his witness at trial, filled the lower position. Mitchell continued to work as a custodian until his contract expired on June 30, 2015. The next day, both Hatton and Mitchell began working in their new positions pursuant to one-year contracts, which is how all non-vested FCPS workers are employed.

Mitchell was aware of this new position's job requirements, and he was concerned his illiteracy would make it difficult to obtain a CDL. But, his immediate supervisor, Lead Grounds Worker (Grade 16) Tony Martin, told him, "Don't worry about it. We'll get that CDL." Martin's supervisor at the time, Grounds Supervisor (Grade 18) Geno Pyles, gave him the same assurance. Trial testimony showed these two supervisors were never diligent in enforcing FCBE's CDL requirement for that position. Mitchell was not the first who lacked the required CDL when hired. Some of those other hires took months to obtain it.

Soon after Mitchell began his new position, Geno Pyles retired. Sue Marshall, Lead Grounds Worker (Grade 16) of a different crew than Mitchell's, was promoted over Tony Martin to replace Pyles as Grounds Supervisor. Witnesses described Pyles' management style as "laid back," contrasting it with Sue Marshall who was more "hands-on." Mitchell said, "Mr. Pyles never pushed the CDL real hard because we had two, three white guys who did have it and I didn't have my CDL."

Two months after succeeding Pyles, Sue Marshall started "pushing" each Grounds Worker II (Grade 14) who lacked a CDL to obtain it. She identified four employees at that grade without a CDL. In addition to Mitchell, there were three Caucasian men without CDLs – Michael Mazzoni, Chris Combs, and Scott Hatton, who successfully applied to fill a subsequent Grade 14 vacancy.

In December 2016 or January 2017, when Mitchell claims the race discrimination began, Marshall's superior, Director of Plant Operations Ken Tate, gave each of the similarly situated employees a written deadline by which to obtain a CDL or have his one-year employment contract non-renewed. The writing was not produced but witnesses testified each worker was given the same deadline to complete the requirement. Each of these four workers responded differently.

According to Tony Martin, these four employees "had incentive . . . to go pass the CDL" because "there was a [Lead Grounds Worker (Grade 16)] job opening at that time." The opening did motivate Mazzoni who learned about the position in the spring of 2017.

Mazzoni obtained his CDL soon after the deadline to obtain it was imposed. This credentialed him to pursue the open Lead Grounds Worker (Grade 16) position Martin identified.[1] On May 8, 2017, he interviewed with five (5) other applicants for the position and, although Mazzoni was not the interviewers' first choice, he was offered and accepted the job after their first choice declined.

Even with contract non-renewal at stake, neither of the other two Caucasian men obtained a CDL. Combs avoided contract non-renewal by voluntarily leaving employment with FCPS before his contract expired and, as far

---

[1] The CDL was also a job requirement for the position of Lead Grounds Worker (Grade 16). An additional requirement for that position was a spray pesticide license.

-4-

as any witness knew, Chris Combs "went to the Carolinas." The third Caucasian Grade 14 employee, Scott Hatton, had the decision made for him by FCBE.

The spring of each year is when FCBE decides which of all its employees' contracts to renew. In the spring of 2017, there were only two Grounds Worker II (Grade 14) employees who did not have a CDL – Scott Hatton and Mitchell. Hatton testified that, on March 27, 2017, his contract was non-renewed for the very reason promised – failure to obtain a CDL. (Video Record (VR) 3/21/23; 1:49:40 – S. Hatton Test.) Despite his non-renewal notice, he determined to serve out his existing employment contract through June 30, 2017.

Mitchell had worked three months longer than Hatton as a Grounds Worker II (Grade 14) without a CDL. However, by all accounts, Mitchell was trying harder and repeatedly testing to obtain his CDL while Hatton, by his own admission, "didn't have much speed about getting it." (*Id.*) On March 29, 2017, two days after FCBE non-renewed Hatton's contract, FCBE did renew Mitchell's contract. On June 8, 2017, Mitchell succeeded in obtaining his CDL. As of briefing in this case, he remains employed as a Grounds Worker II (Grade 14).

On June 15, 2017, two weeks before Hatton's employment contract expired, Ken Tate asked HR Director Moss to post a Grounds Worker I (Grade 12) position recently vacated by Jody McCall, another of Mitchell's co-workers. That grade did not require a CDL. Seven Caucasian men, one African American man,

and one woman applied for the position.[2]  One applicant was Scott Hatton whose

employment contract was about to expire.  He interviewed and was offered the

lower-grade job under a new 2017-2018 contract.

These are the basic relevant facts of this case.  However, additional

facts will be noted in the analysis as necessary or informative.

### MITCHELL'S RACE DISCRIMINATION CLAIM

On April 27, 2018, Mitchell filed suit alleging two counts of

employment discrimination against FCBE for violating KRS[3] 344.040(1), part of

the Kentucky Civil Rights Act (KCRA).  The jury found FCBE not liable for

discrimination based on Mitchell's literacy disability.  Therefore, FCBE appeals

only the jury's verdict that Mitchell proved his race discrimination claim.

Mitchell alleged he "experience[d] discriminatory and disparate

treatment[,]" that his "transfer request . . . was denied by Sue Marshall" who

"allowed younger white males similarly situated to the Plaintiff to transfer upon

their request . . . ."  (Trial Record (TR) 5-6, Complaint, ¶¶ 12, 18, 20; TR 8,

Complaint, ¶ 40 ("disparate treatment . . . and loss of promotion").)  In this specific

discrimination count he says, "Plaintiff is an African-American who has been

---

[2] One female whose race was not identified applied for the position but declined an interview.
(Def. Exh. 21(f), p. 4.)

[3] Kentucky Revised Statutes.

subject to disparate treatment by his supervisors solely due to his race." (TR 9, Complaint, ¶ 49.)

Mitchell uses the terms – "disparate treatment," "white males similarly situated," "loss of promotion," and "not allowed to transfer" – to claim FCBE treated similarly situated Caucasian employees more favorably, resulting in adverse employment actions, because of his race.

There is no claim of a hostile work environment, a claim which requires no proof of an adverse employment action, nor was the Complaint ever amended. However, it does use the phrase "uncomfortable work environment." (TR 5, Complaint, ¶ 17.) This prompted FCBE Counsel to seek clarification during discovery. When she deposed Mitchell, she asked if his use of the phrase "uncomfortable work environment" meant he was alleging someone at FCPS "made a *racially*-hostile work environment for you," and he responded: "No, I'm not saying that." (TR 341, FCBE Memorandum Supporting Motion for Summary Judgment, filed Feb. 3, 2023, quoting TR 379-80, Mitchell Depo., p. 173 (emphasis added).) His complaint also clarifies that his "uncomfortable work environment" comment related to his disability discrimination claim that he "suffered embarrassment and humiliation" when his learning disability was revealed, he was called "illiterate" and "a 'dumb ass' because of a problem [operating] a weed-eater[,]" and that on "a posting [of] a monthly employee

birthday list in the work office . . . [his] name did not appear on the list." (*Id.*; TR 7, Complaint, ¶¶ 33, 34, 36-40.)

Nevertheless, the precise nature of Mitchell's claim again arose during trial when Mitchell's evidence seemed less focused on proving the elements of a disparate treatment claim and more on the workplace atmosphere. Before the jury returned on the second day of trial, FCBE objected that Mitchell's counsel's questioning of his witnesses "has turned this case into a hostile work environment [case] as opposed to an individual discrimination case . . . ." Mitchell's counsel responded, "Not one time out of my mouth, did come 'hostile work environment.'" (VR 3/21/23; 9:07:40 – Mitchell Counsel.) The trial court agreed, "It did not," and a few minutes later stated, "Mr. Dove [Mitchell's counsel] did not, according to the court's recollection, ever use the term 'hostile work environment.'" (VR 3/21/23; 9:07:49 and 9:09:35 – Trial Court.)

The issue arose once more when jury instructions were addressed at the close of Mitchell's case and after denial of FCBE's directed verdict motion. The trial court asked if there had been any change from the original instructions that made no reference to hostile work environment. Counsel had differing views.

FCBE's counsel said there was a change because Mitchell's counsel electronically filed "a revised jury instruction last night [after the second day of trial] attempting to make a hostile work environment claim which is not explicitly

pled in the Complaint and was not addressed in the original instructions." (VR 3/22/23; 8:30:39 – FCBE Counsel.) Mitchell's counsel again disagreed.

"We did not ask for a hostile work environment instruction[,]" Mitchell's counsel responded: "I don't know where that comes from." (VR 3/22/23; 8:31:54 – Mitchell Counsel.) But the Proposed Second Amended Jury Instructions Mitchell electronically filed the night before expressly ask the jury to determine whether FCBE engaged in conduct "so severe OR repetitive that it had the purpose or effect of unreasonably interfering with a Pl[aintiff's] work performance or creating an intimidating, hostile or offensive work environment for a reasonable employee of Plaintiff's race." (TR 491 – Plaintiff's Amended Proposed Jury Instruction.) FCBE's counsel, therefore, was justified in trying to clarify what claims she was defending for her client, and she pressed the point.[4]

Perhaps because the proposed revised instruction directly contradicted her opposing counsel's denial about what claim he was pursuing, FCBE's counsel stated, "The defendants do not believe that such an instruction is warranted, . . . but if the court chooses to instruct the jury on hostile work environment, the *Lumpkin* instruction is the law of the Commonwealth." (VR 3/22/23; 8:30:58 –

---

[4] A hostile work environment claim based upon race discrimination is reviewed under the same standard as sexual harassment claims. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 n.1, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). It requires no proof of an adverse employment action. The defense strategy necessarily would differ from that prepared against a disparate treatment claim.

FCBE Counsel.)[5] Mitchell's counsel saw no need and approached the bench with a copy of his Proposed Second Amended Jury Instructions and repeated, "There's not one word in here that says anything about hostile work environment." (VR 3/22/23; 8:33:00 – Mitchell Counsel.) The trial court reviewed the copy Mitchell's counsel handed her and agreed, "I don't see where it talks about hostile work environment . . . ." This is inexplicable because the revised instruction partially quoted above includes express reference to a "hostile or offensive work environment" and it was Mitchell's amended version that instructed the jury.

Although the instruction, on its face, contradicts Mitchell's counsel's insistence he did not want to instruct the jury on a hostile work environment claim, the proof is in the pudding – closing arguments. "The Kentucky practice of 'bare bones' instructions applies to all litigation including civil rights cases. The concept permits the instructions to be 'fleshed out' in closing argument." *Lumpkins*, 157 S.W.3d at 605 (citing *Rogers v. Kasdan*, 612 S.W.2d 133 (Ky. 1981)).

When Mitchell's counsel presented closing argument, he "fleshed out" his client's disability claim for almost ten (10) minutes, his disparate treatment race discrimination claim for four (4) minutes, and he spent his final

---

[5] FCBE's counsel, upon receipt of Mitchell's counsel's Proposed Second Amended Jury Instructions the night before, immediately electronically filed its preferred Hostile Work Environment Instruction, basing it directly on the instruction expressly approved in *Lumpkins ex rel. Lumpkins v. City of Louisville*, 157 S.W.3d 601, 604-05 (Ky. 2005). It was rejected by Mitchell's counsel and the trial court.

three (3) minutes on damages. (VR 3/22/23; 5:55:00 – Mitchell Counsel, Closing Arg.) Not once did Mitchell's counsel make any allusion to any intention to present a racially hostile work environment claim.

In this Court, neither party makes any argument or reference in any of the briefs suggesting what was adjudicated here was a claim that Mitchell's workplace was a racially hostile work environment. It is more than clear that Mitchell intended to present a race discrimination claim based on his disparate treatment relative to similarly situated white employees that resulted in an adverse employment action – FCBE's refusal to demote, transfer, or promote Mitchell. It is just as clear that is how the trial court adjudicated the case. "'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S. Ct. 1701, 1705, 123 L. Ed. 2d 338 (1993) (internal quotation marks and citation omitted). Therefore, we review this case as a disparate treatment claim, judgment, and appeal.

The trial court's comments relative to its denial of FCBE's directed verdict motion indicate a misunderstanding of a discrimination claimant's burden of production at trial. The court based its denial of directed verdict on a belief it was enough for Mitchell to present evidence of discrimination – the ultimate

-11-

question for the factfinder.  That belief led to the court's failure to perform its own role as gatekeeper of the evidence, to determine whether what Mitchell produced supported "the existence of all four factors" of a circumstantial-evidence-based disparate treatment claim; *i.e.*, "that the four elements of the *prima facie* case are present." *Kozlowski v. Hampton School Bd.*, 77 F. App'x 133, 140 (4th Cir. 2003) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 n.3, 113 S. Ct. 2742, 2748 n.3, 125 L. Ed. 2d 407 (1993)).  *See Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 725-26 (Ky. 2020) (trial court's "gatekeeping function to ensure only meritorious . . . claims that are based on circumstantial evidence are submitted to the jury" is met by requiring production of evidence of each *prima facie* claim element).

Generally, those four elements are:  (1) membership in a protected class; (2) an adverse employment action; (3) application and qualification for an available position; and (4) preferential treatment of similarly situated individuals not belonging to the protected class.  If the discrimination claimant fails to produce evidence of each element at trial, "verdict must be for the defendant[.]" *Id.*  The trial court failed to perform this essential gatekeeping function.  We discuss these elements as they apply in this case more specifically below.

The record shows Mitchell only produced evidence of the first element but not of the other three.  Therefore, FCBE was entitled to a directed

-12-

verdict. Our role here, however, is not merely to decide whether the trial court erred, but why. Therefore, we begin with a discussion of the federal jurisprudence guiding our own decisions in discrimination cases. That discussion reveals an idiosyncrasy of Kentucky jurisprudence, never before addressed in this context, that impacts application of the federal guidance at the summary judgment stage because of *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991).

### THE *McDONNELL DOUGLAS* FRAMEWORK AS APPLIED SINCE *STEELVEST, INC. v. SCANSTEEL SERVICE CENTER*

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court of the United States created a framework for allocating the burdens and order of circumstantial proof when direct proof is not available in federal claims of discriminatory treatment under Title VII of the Civil Rights Act of 1964. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981). In 1984, Kentucky adopted the framework for comparable state claims. *Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984). Our courts to this day apply it in discrimination cases brought pursuant to the KCRA. *Norton Healthcare*, 600 S.W.3d at 714 (citing *McDonnell Douglas*).

But there is more to understanding the framework's application in Kentucky courts than simply knowing the four elements of a *prima facie* claim and

-13-

the framework's three-step burden-shifting protocol. When the Kentucky Supreme Court adopted the framework in 1984, it acknowledged it was adopting "a different standard for a summary judgment . . . than usually applies." *Harker*, 679 S.W.2d at 229 (citing *McDonnell Douglas*). Since then, our summary judgment jurisprudence evolved in a way that diverges from federal practice, yielding more favorable results at that stage for discrimination claimants in Kentucky courts.

McDonnell Douglas*'s three-step framework – step one*

The *McDonnell Douglas* framework serves as "a burden-shifting mechanism . . . in deciding motions for summary judgment or directed verdict." *Norton Healthcare*, 600 S.W.3d at 712. It is comprised of three steps.

In the first step, the employee must "carry the initial burden . . . of establishing a *prima facie* case of racial [or other category of protected-class] discrimination."[6] *Id.* at 714 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824). That burden is one of production, not proof. If the employee fails to satisfy this first-step burden, his case is dismissed. If he succeeds, then from that time until trial begins, his claim achieves "the status of a rebuttable presumption, or *prima facie* case, which means from a procedural standpoint that in the absence of evidence sufficient to cast substantial doubt in the mind of a reasonable man[,]

---

[6] The *prima facie* claim itself is comprised of specific elements that vary slightly depending on the nature of the specific claim. Below, we discuss the nature of Mitchell's claims and the specific applicable elements in this case. In this part of the Opinion, however, our focus is procedure.

-14-

that the presumption is correct[.]" *Williams v. Brown-Forman Corp.*, 640 S.W.3d 73, 84 (Ky. App. 2021) (internal quotation marks and citation omitted).

To be clear, however, just because the employee satisfies his first-step burden in response to a summary judgment motion, it does not mean the employer must rebut the presumption before trial or lose the case. As the Supreme Court of the United States explained, "We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated.*" *St. Mary's Honor Ctr.*, 509 U.S. at 514-15, 113 S. Ct. at 2751 (emphasis original). The Court here refers to the *ultimate burden of persuasion* the employee must carry at trial.

Rather, the Supreme Court did what it could by "establish[ing] certain modes and orders of proof, including an initial rebuttable presumption . . . , which we believe *McDonnell Douglas* represents." *Id.* This all aligns nicely with Kentucky's own rules regarding burdens of production and proof. CR[7] 43.01. It is only at trial that the employer risks summary disposition (directed verdict) in favor of the employee by failing to produce any evidence of a legitimate, non-discriminatory reason for any adverse employment action. CR 43.01(1). In summary, when the time comes, the employer must satisfy his second-step burden.

---

[7] Kentucky Rules of Civil Procedure.

-15-

Until then, however, the onus of establishing a circumstantial discrimination claim remains the claimant's burden of evidence production.

McDonnell Douglas*'s three-step framework – step two*

At *McDonnell Douglas*'s second step, the employer has the "opportunity 'to articulate some legitimate, non-discriminatory reason[s] for'" the employment action the claimant claims was illegally discriminatory. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213, 135 S. Ct. 1338, 1345, 191 L. Ed. 2d 279 (2015); *Norton Healthcare*, 600 S.W.3d at 714 (employer's burden "to articulate some legitimate, nondiscriminatory reason" for employment action). Just as the employee's first-step burden is one of production, "the burden of refuting the *prima facie* case need not be met by persuasion; the employer need only articulate with clarity and reasonable specificity, a reason unrelated to a discriminatory motive . . . ." *Kentucky Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 700 (Ky. App. 1991). This opportunity for rebuttal is available until the employer announces close at trial. "If the employer successfully articulates such a reason, he has rebutted the claimant's *prima facie* case," and the burden shifts back to the employee. *Walker v. Commonwealth*, 503 S.W.3d 165, 174 (Ky. App. 2016) (citing *McDonnell Douglas*, 411 U.S. at 807, 93 S. Ct. at 1826-27).

The framework's first and second steps identify *intermediate burdens* of evidence production. *See Burdine*, 450 U.S. at 253-57, 101 S. Ct. at 1093-96

(discussing the parties' "ultimate and intermediate burdens").  As discussed below, without the need for factfinding, it is the trial court's role – whether on motion for summary judgment or directed verdict – to decide whether the burden of production at each intermediate step of the framework is satisfied.  In fact, the Supreme Court of the United States expects trial courts to make those intermediate step determinations on the record before proceeding to the third step – the *ultimate* burden.  *Id.* at 260 n.12, 101 S. Ct. at 1097 n.12 ("District Court made no findings on the intermediate questions posed by *McDonnell Douglas*.").  Our Supreme Court is in accord.  *Norton Healthcare*, 600 S.W.3d at 727 ("requirement of the *McDonnell Douglas prima facie* case is an issue that must be decided by the trial court").

McDonnell Douglas*'s three-step framework – step three*

To be sure, the purpose of the *McDonnell Douglas* framework is to dispense with "claims lacking merit . . . through summary judgment" at the first step, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 998-99, 152 L. Ed. 2d 1 (2002), or otherwise "bring the litigants and the court expeditiously and fairly to this ultimate question."  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093-94.

Only in the third step does factfinding become necessary.  There, "the inquiry proceeds to a new level of *factual specificity* requiring the [employee] to prove her *ultimate burden* of persuading the trier of fact that she is the victim of

intentional discrimination and that the reasons given by the employer are merely pretextual." *Handley*, 827 S.W.2d at 700 (emphasis added). *See also Norton Healthcare*, 600 S.W.3d at 719.

*Trial court's duty to assess satisfaction of the intermediate burdens*

The intermediate burdens are measured by standards of evidence *production*, determinable by the judge, on motions for summary judgment or directed verdict. Each stage employs its own standard. If the judge finds the parties met their respective burdens of production, thereby necessitating factfinder participation at the third step, the standard in the civil trial is one of *proof* – the preponderance of the evidence standard. In turn, the appellate review standard depends on which stage the legal error is alleged to have occurred.

In the instant case, application of the *McDonnell Douglas* framework was implicated at both the summary judgment and directed verdict stages and, consequently, also when FCBE moved for judgment notwithstanding the verdict (JNOV). This review provides an opportunity to explain how and why the divergence of federal and Kentucky procedural law affects the framework's application in Kentucky courts at the summary judgment stage.

McDonnell Douglas *at the summary judgment stage*

As is common in employment discrimination litigation, the *McDonnell Douglas* framework first arose in this case when FCBE tested

Mitchell's claim by filing a summary judgment motion. The trial court's denial of the motion is moot here and FCBE is not challenging it. *See Transp. Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 38 (Ky. App. 1988) ("once the trial begins, the underlying purpose of the summary judgment expires"). However, we discuss it here to emphasize a point which the trial court seemed not to understand. That point is this. A claimant's success in satisfying his first-step intermediate burden of demonstrating a *prima facie* claim at the summary judgment phase does not forever satisfy a claimant's duty of producing evidence of a *prima facie* claim. Such evidence must again be produced at trial where the claimant's summary judgment success is no assurance of the same success when the employer moves for directed verdict.

In fact, our Supreme Court "made clear" that even if an employee succeeds "in establishing a *prima facie* case" at the summary judgment stage, it "does not always mean the plaintiff has presented evidence sufficient to survive a motion for a directed verdict if it is clear that the evidence would still not be enough to sustain a jury's finding of liability." *Norton Healthcare*, 600 S.W.3d at 720 (discussing *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 499 (Ky. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000))). Denial of summary judgment simply means "all matters of . . . law procedurally merge into the trial phase,

-19-

subject to in-trial motions for directed verdict or dismissal and post-judgment motions for new trial and/or judgment notwithstanding the verdict." *Leneave*, 751 S.W.2d at 38.

Because of Kentucky's divergence from federal practice in the context of the summary judgment analysis, two things are true: (1) a discrimination plaintiff is more likely to succeed in Kentucky courts than in federal courts when compelled to satisfy the first-step intermediate burden of production in response to a summary judgment motion; and (2) in Kentucky, the same production of evidence that succeeds in response to a summary judgment motion will not guarantee success in response to a directed verdict motion.

Procedurally, it is easier for an employee in Kentucky state courts than it is in federal courts to survive the employer's summary-judgment-motion testing of the employee's *prima facie* claim. That has been so since 1991 when the Kentucky Supreme Court rejected the federal approach to summary judgment adopted during the 1985-86 term of the Supreme Court of the United States "allowing and encouraging summary judgment to be more readily granted." *Steelvest*, 807 S.W.2d at 481 (footnote omitted). The Sixth Circuit acknowledged this greater chance of surviving the employer's challenge to a *prima facie* claim of discrimination when a Kentucky employee thought she could prevail in her appeal of a KCRA-based discrimination case by simply arguing "a federal court in

diversity should apply Kentucky's summary judgment standard as expressed in *Steelvest . . . ." Gafford v. General Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010). Because the *Steelvest* approach to summary judgment motions favors the respondent more under CR 56 than the federal approach under FRCP[8] 56, Gafford might have prevailed if the Sixth Circuit had not repeated and applied the axiom that federal rules of procedure apply in federal court. *Id.* at 166-67. We do know summary judgment is harder to come by in Kentucky courts, but just why exactly?

Three related and notable distinctions between the state and federal approaches are the reason. Each impacts the *McDonnell Douglas* framework. First, under FRCP 56, the movant's "burden does not necessarily require the movant to produce evidence showing the absence of a genuine issue of material fact, but only that he show that there is an absence of evidence possessed by the respondent to support an essential element of his case." *Steelvest*, 807 S.W.2d at 482. "This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Id.* at 481. The federal approach forces the

---

[8] Federal Rules of Civil Procedure.

employee to reveal the cards he holds without requiring the employer to tip his own hand. That is not enough in Kentucky.

"Under the present practice of Kentucky courts, the movant must convince the court, by the evidence of record, of the nonexistence of an issue of material fact." *Id.* at 482. In the context of the *McDonnell Douglas prima facie* claim, the employer must present affirmative evidence to establish the negative of at least one element of the employee's *prima facie* claim.

The second significant distinction is the quantum of evidence an employee must produce to defeat a summary judgment motion. "[U]nder the federal summary judgment standard, the 'scintilla' rule applies and summary judgment will be granted to the movant unless there is evidence on which a jury could reasonably return a verdict in the respondent's favor." *Id.* The respondent to a FRCP 56 motion "must adduce more than a 'scintilla' of evidence to overcome the motion . . . ." *Id.* at 481. In Kentucky, even a scintilla of evidence can be enough to survive summary judgment.

In Kentucky state courts, "the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy. . . . Only when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the motion for summary judgment be granted." *Id.* at 482. In other words, a mere scintilla of

evidence to support each of the elements of a *prima facie* claim could suffice. *Cf.*

*Biederman v. Commonwealth*, 434 S.W.3d 40, 47-48 (Ky. 2014) (more than a mere

scintilla of evidence is needed to survive directed verdict).

The third distinction ties the first two together. "[U]nder the federal

scheme, the test for summary judgment is the same as that for a directed verdict."

*Steelvest*, 807 S.W.2d at 482. That is not so in Kentucky state courts. "[T]he

consideration to be given to the two motions is not the same . . . ." *Id.* "[W]e

recognize that summary judgment is not . . . the functional equivalent of a motion

for directed verdict." *Id.* at 480. In Kentucky courts, "summary judgment is a

more delicate matter [in] that its inquiry requires a greater judicial determination

and discretion since it takes the case away from the trier of fact before the evidence

is actually heard." *Id*. at 482. Perhaps that notion springs from Kentucky's

Constitution which declares "[t]he ancient mode of trial by jury shall be held

sacred . . . ." KY. CONST. § 7. Of course, that may not be so regarding

discrimination claims. *Ky. Comm'n on Human Rights v. Fraser*, 625 S.W.2d 852,

854 (Ky. 1981) ("Because the right to be free from discrimination . . . is a creature

of statute and not a common-law tort, it does not fall within the scope of the right

to trial by jury preserved by the seventh amendment [to the United States

Constitution] and by Section 7 of the Kentucky Constitution."). Even then, this

will not ease *Steelvest*'s strictures on an employer's pursuit of summary judgment.

-23-

Because it is more difficult for the Kentucky summary judgment movant to succeed, logic compels the conclusion that a greater percentage of discrimination claims will make it to trial in Kentucky courts than in federal courts. That is another way of saying that, although "the KCRA tracks federal case law for guidance[,]" *Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016), it must track it a little more loosely during the summary judgment stage because that federal guidance is qualified by the stricter *Steelvest* rules.

Given *Steelvest*'s impact on the *McDonnell Douglas* framework, it is little surprise the trial court held Mitchell satisfied the framework's first-step intermediate burden of production at the summary judgment stage. The ruling allowed Mitchell's claim to proceed to trial. At trial, however, the guidance of federal jurisprudence applies without qualification. Our Supreme Court, from that point on, interprets all the civil rights provisions of KRS Chapter 344 as "consistent with the applicable federal anti-discrimination laws." *See Williams*, 184 S.W.3d at 495 (citations omitted); *Irvin v. Aubrey*, 92 S.W.3d 87, 90 n.3 (Ky. App. 2001) ("[F]ederal standards are used in evaluating discrimination claims under the Kentucky [Civil Rights A]ct." (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000))).

Also, because the federal summary judgment and directed verdict standards are the same, and because the federal and Kentucky directed verdict standards are the same, federal summary judgment jurisprudence is persuasive (though not precedential) in deciding Kentucky directed verdict motions.

McDonnell Douglas *at the directed verdict stage*

Repeating, then, the employee's satisfaction of his intermediate burden of production when tested by motion for summary judgment is no guarantee it will suffice at trial. *Steelvest* unmistakably holds that a scintilla of evidence can be enough to survive a Rule 56 challenge but, at trial, Kentucky still adheres to the rule that, "[t]o survive a motion for directed verdict, the opposing party must have presented evidence of substance, more than a mere scintilla of evidence." *Biederman*, 434 S.W.3d at 47-48.

"The party holding the affirmative of an issue must produce the evidence to prove it." CR 43.01(1). In a discrimination case, that burden of production is borne first by the disaffected employee. The rule requires the employee to produce direct or circumstantial evidence to prove it. Whether direct or circumstantial, the employee's production of evidence must satisfy the directed verdict's higher standard of more than a scintilla of evidence.

When the employee has no direct evidence of employment discrimination, as in this case,[9] he must use the *McDonnell Douglas* framework to prove his claim at trial by circumstantial evidence. *Williams*, 184 S.W.3d at 495. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S. Ct. 1478, 1481, 75 L. Ed. 2d 403 (1983) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S. Ct. 1843, 1866, 52 L. Ed. 2d 396 (1977) ("*McDonnell Douglas* formula does not require direct proof")).

Although the basis of a KCRA employment discrimination claim is KRS 344.040, Kentucky disparate treatment claims follow the federal guidance requiring production of evidence of each of the four elements of the *prima facie* claim. The employee must produce evidence at trial "demonstrat[ing] at least that his rejection [*i.e.*, denial of demotion, transfer, or promotion] did not result from

---

[9] There is no direct evidence of employment discrimination in this case.

> An example of direct proof of outlawed discrimination would be evidence of an announcement by the decision-maker to the ex-employee. "I fired you because you are disabled [or are a member of some other legally protected minority classification]." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759-60 (6th Cir. 2000) (collecting Sixth Circuit decisions which mandated that only pertinent comments proximately made by company decision-makers may constitute evidence of discriminatory animus by the defendant). "[M]erely vague, ambiguous, or isolated remarks" by a company agent which were not related to the decision-making process and were not made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of outlawed employment discrimination to create a jury question. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330-31 (6th Cir. 1994).

*Das v. Ohio State Univ.*, 57 F. App'x 675, 678-79 (6th Cir. 2003).

. . . an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Int'l Bhd. of Teamsters*, 431 U.S. at 358, 97 S. Ct. at 1866. At trial, the employee holds the affirmative of "show[ing] that she suffered an 'adverse employment action' as that term is defined under federal law." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004).

This underscores a point previously made – the employee's success at the summary judgment stage means nothing at trial. Once trial starts, the *McDonnell Douglas* framework of shifting burdens of production "drops from the case" to be replaced in Kentucky by CR 43.01. *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095. However, the *presumption* continues to serve the trial court. "[P]resumptions, by their nature, are 'guides to be followed by the trial judge in determining whether there is sufficient evidence to warrant the submission of an issue to the jury[.]'" *Norton Healthcare*, 600 S.W.3d at 723 (quoting *Mason v. Commonwealth*, 565 S.W.2d 140, 141 (Ky. 1978)). That is, the employee must still produce evidence entitling him to the *McDonnell Douglas* presumption – *i.e.*, the same evidence required by CR 43.01 to support the elements of the claim itself.

Reciprocally, presuming the employee produces at trial more than a scintilla of evidence of each element of the *prima facie* claim, the employer must "produce evidence of a legitimate reason for [such action] to survive a motion for a directed verdict." *Norton Healthcare*, 600 S.W.3d at 708. Judge Bertelsman,

-27-

former federal judge of the Eastern District of Kentucky, helpfully and practically,

explained this process.[10]  Bench and bar are well-advised to study it.

---

[10] Judge Bertelsman said the following in a "restatement of the law reflected by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)":

> *Even though the* prima facie *case may have been enough to shift the burden of production to the defendant, it is not necessarily enough to entitle the plaintiff to submit his or her case to the jury.*  This is the principle plaintiffs here fail to understand.  To avoid confusion in this kind of case, it is absolutely essential to distinguish the two meanings of the term "*prima facie* case."  As made clear by a careful reading of the *Burdine* opinion, *the plaintiff may have adduced a* prima facie *case in one sense, that is, shifted the burden of production, without having adduced one in a second sense of producing sufficient evidence to meet the challenge of a motion for directed verdict.*  For purposes of illustration, it is helpful to employ two distinct terms for the two kinds of "*prima facie* case."  "*Prima facie* case (production)" and "*prima facie* case (persuasion)" will do as well as any.  Using these terms for clarification, the law concerning burden of proof in these cases may then be stated as follows:
>
> (1) The plaintiff adduces evidence making out a *prima facie* case (production).
>
> (2) If the defendant offers no evidence plaintiff is entitled to a directed verdict.
>
> (3) If the defendant offers admissible evidence of a non-discriminatory reason for the adverse action, the plaintiffs may then introduce further evidence to show that the defendant's reason is a pretext *for discrimination.*
>
> (4) Then upon a motion for directed verdict, the court must re-evaluate all the evidence to see if plaintiffs have made out a *prima facie* case (persuasion).  In doing so, the court must consider the evidence plaintiff offered earlier in establishing the *prima facie* case (production) as well as all other evidence.
>
> (5) But the fact that plaintiff earlier established a *prima facie* case (production) does not automatically mean that he has established a *prima facie* case (persuasion).  That must be determined by the court in utilizing the usual directed verdict tests.

*Askin v. Firestone Tire & Rubber Co.*, 600 F. Supp. 751, 755-56, 756 n.7 (E.D. Ky. 1985), *aff'd*, 785 F.2d 307 (6th Cir. 1986) (emphasis original).

# MITCHELL'S *PRIMA FACIE* CLAIM OF RACE DISCRIMINATION

Mindful of the concepts of notice pleading, in possession of the trial court record to review, and viewing everything in a light most favorable to the prevailing party, Mitchell's disparate treatment claim can fairly be described as alleging three kinds of adverse employment actions. Mitchell says he was:

> (1) denied a *demotion* to a Grounds Worker I (Grade 12) position (TR 6, Complaint, ¶¶ 26-28 ("demotion"));
>
> (2) denied a *transfer* to another position as a Grounds Worker II (Grade 14) (TR 5-6, Complaint, ¶¶ 17-20 ("transfer")); and
>
> (3) denied a *promotion* to a Lead Grounds Worker (Grade 16) position (TR 7-8, Complaint, ¶¶ 35, 40 ("denial of a promotion opportunity")).

Mitchell claims FCBE's respective denials of the demotion, the transfer, and the promotion he sought, were granted to similarly situated white employees. He also claims each of these denials constitutes FCBE's infliction upon him of an adverse employment action, not for a legitimate, nondiscriminatory reason, but because he is African American.

We assess the evidence tending to support the elements of each variant of Mitchell's race discrimination claim after setting out those elements in the following section.

## ELEMENTS OF A DISPARATE TREATMENT CLAIM

The elements a race discrimination claimant must prove at trial when alleging disparate treatment in the workplace vary slightly, depending on the circumstances of each case. Although the elements are fundamentally the same, our courts have variously defined them and not always in the same order.

For example, the first element that must be proved is that the claimant (employee or job applicant) be a member of a "protected group," *Murray v. Eastern Kentucky University*, 328 S.W.3d 679, 682 (Ky. App. 2009) ("had to show that (1) she was a member of a protected group"), or "protected class." *Walker*, 503 S.W.3d at 174 ("must demonstrate that: (1) he is a member of a protected class"). Some opinions use more precise terms such as requiring proof "he belongs to a racial minority[.]" *Jefferson Cnty. v. Zaring*, 91 S.W.3d 583, 590 (Ky. 2002) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824).

There is no dispute that Mitchell satisfies the first element in that he is African American. FCBE's challenges to the verdict focus on the remaining three.

A second element requires proof that the claimant suffered an "adverse employment action." *See, e.g.*, *Murray*, 328 S.W.3d at 682. For job applicants, that can be the employer's failure or refusal to hire the applicant. KRS 344.040(1). Regarding existing employees like Mitchell, that can be many things

including denial of a promotion, but anything that adversely and materially affects an employee's status or conditions of employment can suffice. *Id.*

The adverse-employment-action issue sometimes focuses on the degree of the change in the employment. For guidance, our Supreme Court looked to federal law, saying that not every change will support a claim of discrimination. The change must be materially adverse to the employee, and:

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Brooks*, 132 S.W.3d at 802 (quoting *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999)).[11]

---

[11] *Brooks* adjudicated a claim of employment discrimination based on the employer's retaliation for the employee's engaging in a protected activity. It was rendered before the Supreme Court of the United States' opinion in *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). *White* abrogated *Hollins*, the Sixth Circuit case *Brooks* quotes, indicating it ill-defines adverse employment action in the retaliation claim context. 548 U.S. at 59-69, 126 S. Ct. at 2410-15. *White* holds that the showing required for a Title VII retaliation claim "is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). This distinction might call into question reliance on the *Hollins* quote in future Kentucky retaliation-based discrimination cases, but its applicability to Kentucky employment discrimination cases that parallel Title VII discrimination claims remains valid.

A third element has been stated as requiring that the discrimination claimant "applied and was qualified for a job for which the employer was seeking applicants[.]" *Zaring*, 91 S.W.3d at 590-91. Obviously, this element embraces three facts the claimant must prove: (1) there was a job opening; (2) the claimant applied to fill that vacancy; and (3) he can meet the qualifications for the position.

A fourth element is either that: (1) "'similarly situated' non-protected employees were treated more favorably[,]" *Murray*, 328 S.W.3d at 682, or (2) "the position remained open and the employer continued to seek applicants . . . ." *Zaring*, 91 S.W.3d at 591 (citation omitted). "When determining what employees were 'similarly situated,' the plaintiff must find those that are similar to h[im] in 'all relevant aspects.'" *Murray*, 328 S.W.3d at 682 (citations omitted); *Weickgenannt*, 485 S.W.3d at 308 ("[W]e must select individuals who are similarly situated *in all relevant aspects*." (internal quotation marks and footnote omitted) (emphasis added)). That requirement put upon Mitchell the burden to "present evidence that all relevant aspects of his employment situation are *nearly identical* to those of the employees who he alleges were treated more favorably." *Weickgenannt*, 485 S.W.3d at 308 (edited pronouns) (emphasis added).

An even more exacting definition has been cited from the federal courts by our own Supreme Court in *University of Kentucky v. Carpenter*, No.

-32-

2015-SC-000384-DG, 2017 WL 3634481, at \*3 (Ky. Aug. 24, 2017).[12]  The

original quote from that federal court is as follows:

> Employees are not "similarly situated" merely because
> their conduct might be analogized.  Rather, in order to be
> similarly situated, other employees must have reported to
> the same supervisor as the plaintiff, must have been
> subject to the same standards governing performance

---

[12] Unpublished opinions should not be disregarded out of hand.  As Justice Conley wrote in *Taylor v. Commonwealth*:

> Although unpublished cases as a rule are not meant to be cited as official
> pronouncements of what the law is, it would be disingenuous to say that this Court
> is not bound by oath and fidelity to consistently apply the law in both published and
> unpublished decisions.

671 S.W.3d 36, 42 (Ky. 2023).  This Court of Appeals follows that guidance.  And, in the absence
of any published opinion on point:

> we are free to allow these [unpublished] cases as much or as little *persuasive* value
> as we choose.  Still, we cite them, and distinguish them as necessary, to assure the
> bar of a jurisprudential consistency that transcends the published/unpublished
> distinction.  "While unpublished opinions may, by rule or tradition, lack the
> precedential authority accorded published decisions, unless the issuing courts have
> simply ruled incorrectly, these opinions should be considered correct in their
> expressions of law or application of law to facts."  J. Thomas Sullivan, *Unpublished
> Opinions and No Citation Rules in the Trial Courts*, 47 Ariz. L. Rev. 419, 445
> (2005).

*Turner v. Commonwealth*, 538 S.W.3d 305, 313 n.15 (Ky. App. 2017) (emphasis added).

However, we rely only upon the authority – *Mazzella* – which our Supreme Court cited in its
unpublished opinion, *University of Kentucky v. Carpenter*.  The abbreviated quote from our
Supreme Court's unpublished opinion reads as follows:

> To qualify a similarly situated person, the person "must have reported to the same
> supervisor as the plaintiff, must have been subject to the same standards governing
> performance evaluation and discipline, and must have engaged in conduct similar
> to the plaintiff's, without such differentiating or mitigating circumstances that
> would distinguish their conduct or the appropriate discipline for it."

*Univ. of Ky. v. Carpenter*, No. 2015-SC-000384-DG, 2017 WL 3634481, at \*3 (Ky. Aug. 24,
2017) (quoting *Mazzella v. RCA Global Commc'ns, Inc.*, 642 F. Supp. 1531 (S.D.N.Y. 1986)).

evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.

*Mazzella v. RCA Glob. Commc'ns, Inc.*, 642 F. Supp. 1531, 1546-47 (S.D.N.Y. 1986), *aff'd Mazzella v. RCA Glob. Commc'ns Inc.*, 814 F.2d 653 (2d Cir. 1987) (citations omitted) (quoted, in part, for this definition in *Univ. of Ky. v. Carpenter*, 2017 WL 3634481, at *3).

We apply this jurisprudential guidance to assess the validity of FCBE's first argument on appeal that Mitchell failed to produce evidence to sustain each element of his race-based employment discrimination claim.

## STANDARD OF REVIEW

The Kentucky Supreme Court said in *Meyers v. Chapman Printing*, a sexual harassment case under the KCRA, that "[o]nce the issue" of whether the evidence is sufficient to send the case to the jury "is squarely presented to the trial judge, who heard and considered the evidence, neither [the Kentucky Supreme Court], nor will the Court of Appeals substitute our judgment . . . for [the trial court's] *unless clearly erroneous*." 840 S.W.2d 814, 821 (Ky. 1992) (emphasis added) (quoting *Davis v. Graviss*, 672 S.W.2d 928, 933 (Ky. 1984)).[13] "In

---

[13] "*Davis* was overruled on other grounds by *Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 493-95 (Ky. 2002). *Sand Hill* was subsequently vacated by *Ford Motor Co. v. Estate of*

reviewing this issue of evidential sufficiency the appellate court must respect the opinion of the trial judge who heard the evidence." *Id.* Importantly, however, "a directed verdict is appropriate if the only reasonable inference from the evidence fails to sustain the claim." *Id.* at 822.

"[T]he test for evidential sufficiency is whether any substantial evidence supports the finding . . . ." *United States v. Escarcega-Medina*, 178 F. App'x 442, 443 (5th Cir. 2006) (internal quotation marks and citation omitted)). Our Supreme Court compared the task of reviewing a trial court's ruling on "evidential sufficiency" on the one hand, with a review on the other hand that reveals no proof of one or more elements of a claim, stating, "It is significantly more difficult to overrule such a finding [of evidential sufficiency] . . . than it would be to point out that some simple fact, an element of proof which need not be evaluated, *is missing from the proof*." *Meyers*, 840 S.W.2d at 821-22 (emphasis added). In this case, simple facts, the very necessary elements of proof, are missing from the evidence.

Regarding FCBE's second argument, "abuse of discretion is the proper standard of review of a trial court's evidentiary rulings." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000).

---

*Smith*, 538 U.S. 1028, 123 S. Ct. 2072, 155 L. Ed. 2d 1056 (2003)." *Savage v. Three Rivers Medical Center*, 390 S.W.3d 104, 120 n.7 (Ky. 2012).

## MITCHELL'S CLAIM HE WAS DENIED
## A DEMOTION

FCBE's argument here is twofold:  (1) that an employer's refusal to demote an employee is not an adverse employment action and (2) that no similarly situated white employee was granted a demotion upon request.

### *Refusing employee's demotion request is not an adverse employment action.*

It goes nearly without saying that an employee's "demotion constitutes an adverse employment action." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016).  However, if the verdict is that Mitchell was *denied* a demotion, we cannot affirm unless we turn that concept on its head.  It would be national precedent indeed to affirm the absurdity that both an employer's decision to demote an employee and its decision not to demote him are adverse employment actions.  Refusing to demote an employee simply fails to fit the jurisprudential definition of an adverse employment action.

An adverse employment action is one "that results in a materially adverse change in the terms and conditions of plaintiff's employment[,] such as a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Love v. Elec. Power Bd. of Chattanooga, EPB*, 392 F. App'x 405, 408 (6th Cir. 2010).  If we presume a fact not supported by this record – that no administrative restriction prevented Marshall or Tate from demoting Mitchell – their refusal to do so is quintessentially a refusal

to lower his salary or benefits, a refusal to take away his title, and a refusal to significantly reduce his responsibility – *i.e*., it would be FCBE's refusal to adversely affect Mitchell's employment. That is precisely the kind of employer conduct Title VII and the KCRA were enacted to ensure, not punish.

Not surprisingly, our search of federal and state jurisprudence turned up no authority supporting the notion that denying a demotion is an adverse employment action. However, there are a few lateral-transfer denial cases that provide guidance by analogy. Applying logic to those analyses yields but one conclusion – denying a demotion cannot be an adverse employment action.

A federal court applying Kentucky law said, "A decision to deny a lateral transfer . . . is not, in most circumstances, an adverse employment action." *Perry v. AutoZoners, LLC*, 948 F. Supp. 2d 778, 789 (W.D. Ky. 2013), *on reconsideration in part*, 954 F. Supp. 2d 599 (W.D. Ky. 2013) (citation omitted). "This is because a lateral transfer wherein job responsibilities and pay rate remain the same does not constitute a material change in employment." *Id.* Not granting a demotion request has the same effect. Whether the denial is of a request to transfer or a request to be demoted, both maintain the employee's employment *status quo*.

Presuming as fact that FCBE denied Mitchell's demotion request, it justifies the inference FCBE was benefitting both its employee and itself. Mitchell maintained his position with no adverse change in pay or other benefits and no

change in his employment responsibilities. Importantly to FCBE, denying his demotion avoided creating a new vacancy at Mitchell's higher grade, a patently legitimate, nondiscriminatory reason for denying Mitchell's request.

Deeming an employer's denial of a demotion an adverse employment action is utterly illogical. Demoting an employee and its polar opposite, not demoting an employee, cannot exist in the same universe of adverse employment actions. We can illustrate this by a hypothetical case of employment discrimination based on the employer's decision to demote an employee. Surely a provable defense that the employee begged for the demotion would absolve the employer of liability. Denying an employee's request for an adverse employment action simply cannot logically constitute an adverse employment action.

Perhaps the closest analogy to be found is the "lateral-transfer" case of *Freeman v. Potter*, 200 F. App'x 439 (6th Cir. 2006). In *Freeman*, a United States Postal Service Supervisor in Murfreesboro, Tennessee, sought transfer back to his hometown of Sewanee, Tennessee. *Id.* at 440. His "ranking on . . . a pay and duty schedule [was] . . . EAS-16. The Sewanee position was ranked as an EAS-15." *Id.* Freeman's transfer would have, in effect, been a demotion. However, he argued the transfer would have provided him "the opportunity to run his own office, explaining that *it would have less pressure*." *Id.* at 441 (emphasis

added).  Mitchell, in essence, makes the same "less-pressure" argument.  Mitchell

was trying to avoid the pressure of obtaining his CDL.

"The sole issue presented" in *Freeman* was whether the plaintiff

"offered sufficient evidence to create a genuine issue of material fact that he

suffered an adverse employment action."  *Id.* at 442.  The Court acknowledged that

"an employee need not have suffered one of the 'ultimate employment actions' . . .

to have a viable claim of discrimination[,]" but could base a claim on "other unique

indices."  *Id.*  Unlike a better understood type of employment action that "usually

'inflicts direct economic harm[,]'" a claim relying on these unique indices might

not have a tangibly economic impact.  *Id.* (quoting *Burlington Industries, Inc. v.*

*Ellerth*, 524 U.S. 742, 762, 118 S. Ct. 2257, 2269, 141 L. Ed. 2d 633 (1998)).

Still, the same considerations throughout the analysis remain as follows:

> The [employment] action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Kocsis* [*v. Multi-Care Mgmt., Inc.*], 97 F.3d [876,] 886 [(6th Cir. 1996)] (internal quotations omitted).  A "*de minimis* employment" action is "not materially adverse and, thus, not actionable."  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).  In other words, a "bruised ego" caused by trivial employment actions is not sufficient.  *Kocsis*, 97 F.3d at 886 (citing *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994)).
>
> . . . Importantly, . . . an individual's "subjective impression concerning the desirability of one position over another" is insufficient to render an employer's action materially adverse.  *Mitchell* [*v. Vanderbilt Univ.*], 389 F.3d [177,]

-39-

183 [(6th Cir. 2004)]; *see also Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). Rather, we determine whether a particular employment action was "objectively intolerable to a reasonable person." *Policastro*, 297 F.3d at 539; *see also O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (explaining that an employee's "purely subjective preferences for one position over another" does not "justify trundling out the heavy artillery of federal antidiscrimination law" (internal quotations omitted)); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (explaining that an employee must suffer "objectively tangible harm" to have a viable discrimination claim).

In short, the action must have a "significant detrimental effect" on the employee's status, *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999), as evidenced by objective factors, not subjective impressions.

*Id.* at 442-43.

To be clear, the evidence is unchallenged that FCBE's policies do not permit supervisors to make demotions. All these FCPS employees performed their duties pursuant to a written, year-long contract that coincided with the school year from July 1 to the following June 30. The only adverse employment action FCBE could have taken consistent with FCPS protocols would have been non-renewal of Mitchell's contract. (VR 3/22/23; 9:47:40 – Moss Test.) Even if we suspend our knowledge of that fact and presume FCBE had the power to breach his contract with impunity and proactively demote him, nothing of our analysis changes.

Applying the factors and considerations discussed in *Freeman v. Potter* to Mitchell's claim makes it clear that his case did not "justify trundling out

the heavy artillery of . . . antidiscrimination law[.]" *Freeman*, 200 F. App'x at 442.

FCBE's employment action of "pushing" Mitchell to obtain his CDL instead of

demoting him can hardly be called "more disruptive than a mere inconvenience"

and certainly was not "an alteration of job responsibilities." *Id.* (citing *Kocsis*, 97

F.3d at 886 (internal quotation marks omitted)). Obtaining the CDL was a

qualification for his position, and he knew that when he accepted the offer of

employment. FCPS supervisors and co-workers did everything in their power to

qualify him and the others similarly situated for the positions they were given.[14]

The objective view cannot be ignored that, with their help, he succeeded.

Mitchell's "subjective impression concerning the desirability of one

position over another" is insufficient to be deemed a materially adverse action

taken by FCBE. *Freeman*, 200 F. App'x at 443. We need only ask whether an

---

[14] The record is replete with testimony to the significant efforts undertaken to help all the similarly situated employees who did not have a CDL, most of it revealed by Mitchell's presentation of his case. Supervisors Marshall and Tate "put a gentleman there though that did try to help. So, they didn't just leave them by themselves." (VR 3/20/23; 4:17:20 – Martin Test.) The manuals upon which the test was based were available in the building where the men clocked in every morning, and the vehicles requiring CDL-licensed drivers were nearby. (VR 3/22/23; 11:53:00 – Marshall Test.) "Wet days" – days the weather prohibited the men from performing their normal tasks – were "optimal days to study." (*Id.*) (VR 3/22/23; 11:52:30 – Marshall Test.) The supervisors encouraged the men "to train, study, prepare, and use the truck" on the back lot, "a noted testing ground," allowing practice on "in-cab, walk-around, and actual driving the trucks," all while the men were on the clock and being paid. (VR 3/22/23; 1:39:30 & 1:40:15 – Marshall Test.) Mitchell's African American co-worker, Jody McCall, helped him read the CDL test's written portion as many as thirteen (13) times. (VR 3/20/23; 1:16:35 – Mitchell Test.) Caucasian co-worker Charles "Junior" Hatton, who obtained his CDL in 2000, worked with Mitchell to pass the non-written portion of the test, the "walk-around," and driving portion. (VR 3/20/23; 1:18:10 – Mitchell Test.) (VR 3/21/23; 11:29:30 – C. Hatton Test.)

employer's expectation that an employee acquire a qualification he was supposed to possess when he accepted the position is "objectively intolerable to a reasonable person." *Id.* at 442 (citations omitted). That answer can only be no.

Finally, not being demoted did not have a "significant detrimental effect" on his employment.[15] Quite the contrary. Because of FCBE's reasonable expectation that Mitchell obtain a CDL, he now possesses that license, a qualification not tied to his current employment, but which secures his place and possibilities for promotion at FCPS where he still works, while also enhancing his employability beyond FCPS.

To the extent the jury verdict was that FCBE's action in not demoting Mitchell was an adverse employment action, it cannot be affirmed. FCBE was entitled to directed verdict regarding this variant of Mitchell's claim.

---

[15] The former Mrs. Mitchell sincerely and movingly testified that the stress Mitchell perceived did have an adverse effect on his personal life. (*See, e.g.*, VR 3/21/23; 4:34:30 – Geneva Mitchell Test. ("He felt like I knew too much . . . Eventually, he found someone else he could talk to about it.").) Recently, when a Title VII race discrimination plaintiff made arguments "centered around how she felt . . . , the effect it had on her personal life . . . , and the current climate surrounding race relations in the United States[,]" a federal district court said: "While the Court cannot conclude that any of those arguments is unimportant, none of them constitute a legally sufficient basis upon which Plaintiff can advance her claims past the motion to dismiss stage." *Martin v. Highmark Health Insurance Co.*, No. 2:23-CV-01311, 2024 WL 1458539, at *5 (W.D. Pa. Apr. 4, 2024). *See also Kocsis*, 97 F.3d at 886; *Haimovitz v. United States Dep't of Justice*, 720 F. Supp. 516, 526 (W.D. Pa. 1989) ("Although plaintiff may have concluded that [the employment action] would adversely affect his personal life, the [anti-discrimination laws] only address[ ] those business decisions [that] adversely affect one's employment opportunities.").

### *No similarly situated white employee was granted a demotion upon request.*

Relative to his failure-to-demote claim, Mitchell alleged Marshall refused Mitchell's "offer to accept a demotion" but that "another employee who was white was permitted to accept a demotion . . . ." (TR 6-7, Complaint, ¶¶ 26-27.) Mitchell presented no evidence to support this allegation.

There were only three employees who were similarly situated to Mitchell in that they were of the same employment grade and lacked a CDL. We identified them previously. Although Mitchell's complaint refers to these similarly situated employees in the plural, he identified only one such employee he alleged was allowed to demote upon a simple request – Scott Hatton. Mitchell's own evidence refuted the allegation that Hatton was treated differently.

Scott never testified that he asked for a demotion. To the contrary, he testified that his contract was non-renewed because he did not obtain his CDL by the deadline FCBE gave him. His employment with FCPS would have terminated on June 30, 2017, if another position had not posted for the lower-grade Grounds Worker I (Grade 12) on June 15. He did not like the idea of taking a lower position, saying it was "terrible I had to take the pay cut." (VR 3/21/23; 1:53:00 – S. Hatton Test.) A professional X Games roller blader, Hatton soon left employment with FCPS to open his own business, "Vintage Therapy, it's a vintage clothing business." (VR 3/21/23; 1:45:30 and 1:46:00 – S. Hatton Test.)

Nothing prevented Mitchell from applying for the same lower-grade position, but that would have been nonsensical. A week before the lower position was posted, Mitchell obtained his CDL on June 8, 2017, satisfying a qualification for his current position that he lacked when hired and, presumably, eliminating the stress he claimed he suffered by being "pushed" to obtain it.

The evidence Mitchell presented to support his race discrimination claim that he was disparately treated relative to similarly situated, non-protected employees is woefully short of the proof needed to establish a claim of race discrimination and, in fact, nonexistent. That claim, to the extent it was based on FCBE's denying him a demotion, should never have made it to trial. But because it did, and because no more substantial evidence was presented on this version of his claim than we here set forth, the trial court committed legal error when it failed to grant FCBE's motions for directed verdict and JNOV.

## MITCHELL'S CLAIM HE WAS DENIED A TRANSFER

When the Lead Grounds Worker who hired him, Tony Martin, was on temporary workers' compensation leave, another member of Mitchell's crew was assigned to temporarily lead it. That temporary supervisor was Charles "Junior"

Hatton.[16]  In the second iteration of his race discrimination complaint, Mitchell

alleges:

> (1)  He requested transfer to another crew "due to actions by [Charles 'Junior'] Hatton which created an uncomfortable work environment."  (TR 5, Complaint, ¶ 17.)
>
> (2)  Marshall denied his request for a transfer.  (TR 6, Complaint, ¶ 18.)
>
> (3)  He "believed that there was a policy in place that if a request was made and an opening was available, the request was to be granted."  (TR 6, Complaint, ¶ 19.)
>
> (4)  Marshall allowed "white males similarly situated to [Mitchell] to transfer upon their request, in accordance with the policy."  (TR 6, Complaint, ¶ 20.)

Mitchell, in a position to personally know whether he asked for and was denied a transfer, testified to that effect and this constituted substantial evidence a jury could believe or not believe.  However, he presented no evidence whatsoever regarding the last two allegations.

There is no evidence of a written policy such as Mitchell imagined. The evidence presented by FCBE Human Resources and Compliance Departments employees made it clear the written policy prohibits such informal deviations.

---

[16] Two FCPS employees with the same last name, Virgil Scott Hatton and Charles "Junior" Hatton, should not be confused.  "Junior" Hatton was a long-time FCPS employee who had his CDL since 2000.  (VR 3/21/23; 11:16:10 – C. Hatton Test.)  Both testified in this case.

Marshall and Tate, the testifying supervisors who created written employee evaluations and carried out FCBE's approved personnel actions, also made it clear that they had no authority to deviate from the written employee personnel policies. Mitchell introduced nothing that contradicted these witnesses. As far as any unwritten "policy" or deviations from the actual written FCBE employment policies, there is no evidence at all.

That leaves the last allegation that similarly situated white workers were allowed to transfer upon request. Mitchell never identified a single employee in a non-protected class or otherwise who was allowed to transfer to another crew. Scott Hatton is the only person Mitchell identified as being similarly situated to his employment circumstances. As just discussed, and contrary to the unrefuted proof, Mitchell alleged Hatton received a demotion – a transfer of sorts, we suppose – upon request. But that was a year after Junior Hatton's temporary supervision of Mitchell's team that prompted him to seek a transfer. He identified no one who transferred to any other position in the FCPS system as he alleges was routine.

Finally, as thoroughly discussed above, the denial of a lateral transfer that resulted in no materially adverse consequences cannot support a claim of race discrimination. Mitchell's temporary supervision by Junior Hatton was not "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brooks*, 132 S.W.3d at 802.

Because Mitchell could not present sufficient evidence of a claim of race discrimination based on a failure to transfer him to another crew, FCBE was entitled to a directed verdict. Failure to grant its motion was reversible error.

## MITCHELL'S CLAIM HE WAS DENIED A PROMOTION

This is the weakest of all versions of Mitchell's claim. He presented almost no evidence to support it. Only two of Mitchell's allegations relate to his claim he was denied a promotion. The first references an internal grievance he filed in the autumn of 2017 in which he claims he was denied "a promotion opportunity[.]" (TR 7, Complaint, ¶ 35.) The internal grievance allegations were investigated by FCPS Compliance Officer Lindsay Wright, an African American, who then presented it to FCPS's African American Chief Operating Officer, Myron Thompson, and he concluded the allegations were unsubstantiated. (VR 3/22/23; 4:24:52 & 4:41:30 – Wright Test.; VR 3/20/23; 4:56:13 & 3/21/23; 10:17:10 – Martin Test.) That adverse finding was one reason Mitchell brought his grievance to the judicial system.

The only promotion opportunity this allegation could possibly reference is Junior Hatton's temporary promotion to supervise Mitchell's crew. But the Complaint itself explains, at least in part, why Hatton was chosen over Mitchell. Hatton had a CDL which was required both for the Grounds Worker II (Grade 14) and the Lead Grounds Worker (Grade 16) and Mitchell had yet to

-47-

acquire his CDL. (TR 5, Complaint, ¶¶ 13–14.) Hatton had significantly more time in service at FCPS Grounds Department than Mitchell. Most significantly, Mitchell did not qualify for any promotion, including a temporary one.

Hatton qualified for the FCBE-approved temporary promotion to Lead Grounds Crew (Grade 16). Mitchell did not because he had yet to obtain his CDL. "To show . . . discrimination by failure to promote, 'a plaintiff generally must demonstrate [he] . . . was qualified for a promotion . . . .'" *Walker*, 503 S.W.3d at 174 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000)). It was impossible for Mitchell to present such proof.

Reading the Complaint as generously as possible and considering the proof in a light most favorable to Mitchell, there is only one other possible claim of discrimination by failure to promote. That would be the promotion of Michael Mazzoni from Grounds Worker II (Grade 14) to Lead Grounds Worker (Grade 16). (*See* TR 7, Complaint, ¶ 40.)

As discussed above, Mazzoni obtained his CDL and interviewed for that position on May 8, 2017. Mitchell did not obtain his CDL until June 8, 2017; therefore, he was not yet qualified for the position Mazzoni secured.

Furthermore, Mitchell could not "demonstrate . . . he applied . . . for a promotion . . . .'" *Id.* He acknowledged he never applied for the open Lead Grounds Worker (Grade 16) position or any other FCPS position after 2015.

Mitchell never made out a claim of race discrimination by failure to promote, demote, or transfer, and his claim never should have reached a jury. Because it did reach a jury, based on our thorough review of the record, denying FCBE's motion for judgment notwithstanding the verdict was legal error.

## THE TRIAL COURT'S NUMEROUS ERRONEOUS EVIDENTIARY RULINGS REQUIRE REVERSAL

Additional legal error contributed to this reversible jury verdict, much of which FCBE persuasively argues. The trial court's most obvious abuses of discretion relate to its treatment of testimony about a PowerPoint presentation to FCPS employees following an "Employee Opinion Survey" conducted by a third-party vendor, CMI Consulting Company, and the printed PowerPoint slides themselves, allowed into evidence as Plaintiff's Exhibit 5B.

Brian Simmons, the CMI employee who conducted the survey and who made the presentation, testified that he met with FCPS's Chief Operating Officer, Myron Thompson, and Kiyon Moss, Director of Human Resources, because "[t]hey wanted an opinion survey to assess any needs for, like, their management, their middle management level." (VR 3/21/23; 3:29:45 – Simmons Test.) Race discrimination at FCPS Plant Operations Division where Mitchell worked was not a concern any of these three African Americans discussed.

The surveyed employees were asked to rank their agreement with certain statements on a scale of 1-to-10. None of the survey statements made any

reference to race or racial issues. However, the employees were also permitted to make unlimited anonymous comments. Many did. On average, there were more than ten (10) such comments for each of the survey statements.[17] One can scour CMI's PowerPoint presentation and will find no mention of race or racial issues, with but one exception. One anonymous comment, unrelated to any of the statements the employees ranked, was "Ken is racist."

Not only did the trial court overrule FCBE's objection to admitting at least this anonymous comment from the PowerPoint on hearsay grounds,[18] but it also allowed Mitchell to tell the jury what he thought the survey said – something not supported by any rational inference from the survey itself or Simmons' testimony – that his supervisors "were racists." (VR 3/20/23; 1:40:15 – Mitchell Test.) Then, after overruling FCBE's objection, the trial court urged Mitchell to tell the jury a second time that the survey concluded "they were racists." (VR 3/20/23; 1:40:35 – Mitchell Test.)

---

[17] Plaintiff's Exhibit 5B is fifteen (15) pages. Pages 4 through 9 are copies of slides from the PowerPoint presentation showing bar-graph averages of only six (6) of the thirty (30) agree/disagree statements. The average number of additional comments appended to each of those six (6) pages is greater than ten (10), as follows: p. 4 (8 comments); p. 5 (7 comments); p. 6 (>20 comments); p. 7 (10 comments); p. 8 (10 comments); and p. 9 (10 comments). If we extrapolate those numbers to the remaining twenty-four (24) agree/disagree statements, the total would be greater than three hundred (300).

[18] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Kentucky Rule of Evidence (KRE) 801(c). "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." KRE 802. KRE 803 lists the exceptions the Supreme Court of Kentucky has provided pursuant to KRE 802.

The record repeatedly reveals the trial court's apparent, fundamental misunderstanding of the hearsay rules. The court regularly and erroneously took the position that if a witness personally hears the original declarant utter an out-of-court statement, it is not hearsay and can be repeated in court.

For example, at a bench conference, FCBE's counsel cited KRE 802 and 803 relating to the inadmissibility of hearsay testimony to support her objections to: (1) the survey's anonymous comment; (2) Mitchell's repeating the anonymous comment; and (3) Mitchell's repeating what he believed the survey said. (VR 3/20/23; 1:27:00 – FCBE Counsel.) The trial court overruled the objection stating, "He can testify to what he heard." (VR 3/20/23; 1:29:10 – Trial Court, Bench Conf.) FCBE Counsel reasserted that "what he heard" was hearsay being offered for the truth of the matter and neither the trial court nor Mitchell's counsel identified any exception allowing its admission into evidence. The trial court declined to change the ruling.

There were several other examples of the trial court's rulings suggesting this basic misunderstanding of hearsay. When Tony Martin testified that he heard supervisors say one of Mitchell's co-workers "was wanted gone," FCBE Counsel objected, and trial court ruled as follows:

Trial Court:        . . . If you heard it, that's okay.

Tony Martin:     I heard it, meaning I was there when it
                 was said.

Trial Court:  Okay.  Alright, go ahead.

FCBE Counsel:  Again, objection.  Hearsay.

Trial Court:  Overruled.  Go ahead.

(VR 3/20/23; 4:05:53 – Martin Test.)  There are other illustrations of this errant view, some of which are cited in Appellant's brief.[19]  (Appellant's Br. 14.)

---

[19] In another example of the trial court's confusion regarding the hearsay rule, Mitchell's counsel asked Tony Martin whether he remembered the January 25, 2017, employee meeting when Brian Simmons presented the CMI survey results.  The following exchange occurred:

Mitchell Counsel:  What do you remember about that meeting?

Tony Martin:  . . . [W]e answered questions, and then, for some reason, he put 'em on the board – on the screen up there.  And, when he did, we all just, like, gasped, like, ooh, 'cause we didn't know he was gonna put some of those up there.  Wasn't saying it was from whom.  So, when he would read one of 'em, people in there would go, "Well, we know who said that," and it, because there was a remark of –

FCBE Counsel:  Objection.  Hearsay.

Trial Court:  It's a discussion.  What was there was there.  He was there.  It's overruled.

(VR 3/20/23; 4:41:42 – Mitchell Test.)

And here is another example:

Tony Martin:  At some point in time, it was said, "Something's got to be done around here."

FCBE Counsel:  Objection.  Hearsay.

Tony Martin:  No, I was in the meeting.

Trial Court:  No, it's not hearsay.  Overruled.

-52-

Mid-trial, FCBE presented a written motion and memorandum on the inadmissibility and excludability of all this documentary and testimonial hearsay. Mitchell's counsel declared this motion and memorandum "blindsided" him. The trial court agreed and overruled the motion as "clearly untimely" but without declaring any of the inadmissible evidence non-hearsay and without identifying any applicable exception to the hearsay rule. (VR 3/21/23; 9:08:45 – Trial Court.)

However, at the close of that day's testimony that wrapped up with Mitchell calling Brian Simmons of CMI only as a fact witness, the trial court *sua sponte* revisited its ruling, only to overrule it again. This time the trial court attempted to rely on an exception found in KRE 703. (VR 3/21/23; 5:08:50 – Trial Court.) That Rule says:

> (a) The facts or data . . . upon which an expert bases an opinion or inference . . . [if] known to the expert at or before the hearing. . . . [and i]f of a type reasonably relied upon by experts in the particular field in forming

---

(VR 3/20/23; 4:39:10 – Martin Test.) Arguably, this might have been a proper ruling if the statement had not been offered for the truth of someone's statement in management that something had to be done. However, Mitchell's counsel did not make such an argument and the trial court was responding to the witness's explanation why his repetition of what he heard was admissible – he was in the meeting and heard it. That was sufficient for the trial court.

In yet another example, when a juror was allowed to ask a question, the trial court overruled FCBE Counsel's hearsay objection because of the way the juror framed the question. The trial court emphasized the juror limited the witness's answer to out-of-court statements uttered "in his presence." (VR 3/21/23; 10:34:30 – Trial Court, Bench Conf.) Again, the testimony may not have been offered for the truth of the matter; however, that was not the trial court's basis for overruling the objection. The trial court's basis for allowing the hearsay was because the out-of-court statement was uttered in the witness's presence. That is not an exception to the hearsay rule.

-53-

opinions or inferences upon the subject . . . need not be admissible in evidence.

    (b) If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data relied upon by an expert pursuant to subdivision (a) may at the discretion of the court be disclosed to the jury even though such facts or data are not admissible in evidence. . . .

KRE 703(a), (b).

The obvious problem with relying on this exception is that no expert testified in this case. Neither party identified anyone as an expert. During trial, neither party tried to convert any fact witness to an expert witness. The trial court did not find that to be a problem. The trial court *sua sponte* and quite out-of-the-blue, declared Brian Simmons an expert.

"I think he is clearly qualified," said the trial court over FCBE's objection, and furthermore told FCBE's counsel, "He is your expert." (VR 3/21/23; 4:11:45 – Bench Conf.) The trial court then put the burden on FCBE to disprove Brian Simmons was an expert.

| Trial Court: | *I think he is an expert*. I think *he was retained as an expert* by the – if you can give me some evidence [FCBE] did not hire him to be, to give them opinions or did not appropriate him as an expert, then we can talk about it. But at this point, everything you all have done has gone that way. So, just because you don't label him – |
| --- | --- |

FCBE Counsel:     He wasn't hired to offer opinions . . . .

(VR 3/21/23; 4:07:04 – Bench Conf) (emphasis added).

The trial court then revealed why it declared Simmons an expert.  It interpreted Kentucky case law as allowing anonymous comments and opinions to be introduced at trial if presented as "a type [of data] reasonably relied upon by experts" despite such data being otherwise inadmissible.  KRE 703(a), (b).  That interpretation was erroneous.  The following addresses the case law the trial court cited out of context to support its position.

Because there is no published Kentucky opinion addressing the specific question of the inadmissibility of anonymous comments such as "Ken is racist," *Sparks v. Downing*, No. 2009-CA-001349-MR, 2010 WL 4669011 (Ky. App. Nov. 19, 2010), is, by default and by rule, the most persuasive Kentucky opinion we can turn to "for consideration."  RAP[20] 41(A).  Its analysis harmonizes with broader Kentucky evidence law including, but certainly not limited to, case law addressing "investigative hearsay."  *See Kerr v. Commonwealth*, 400 S.W.3d 250, 258 (Ky. 2013) (inadmissible "anonymous tip was hearsay evidence because it was used, at least in part, to prove the truth of the matter asserted – that the police arrested Kerr because he was trafficking drugs").  *See also Jordan v. Commonwealth*, 74 S.W.3d 263, 269 (Ky. 2002) ("The testimony concerning

---

[20] Kentucky Rules of Appellate Procedure.

information contained in the DSS-150 form did nothing more than put before the jury an unidentified social worker's written belief that appellant's father was *guilty* of abusing D.W.").

*Sparks* is the review of a medical malpractice trial. 2010 WL 4669011, at *2. The plaintiff claimed her surgeon improperly implanted an artificial lens in a part of the eye called the sulcus following cataract surgery. The propriety of that placement "became the focal point of this lawsuit[.]" *Id.* at *1.

The plaintiff wanted her expert witness to testify to the results of an internet listserv[21] survey of ophthalmologists that the lens "should not be implanted in the sulcus." *Id.* at *7. The trial court disallowed it; Chief Justice (Ret.) Joe Lambert and the rest of the *Sparks* panel of this Court agreed.[22] We focused special attention on the lack of indicia of an anonymous survey's trustworthiness.

"As an initial matter," said the Court, "the proposed testimony was *indisputably hearsay* under KRE 801(c) because it included statements from listserv members . . . ." *Id.* at *8 (emphasis added). In *Sparks*, as in this case, none

---

[21] The term "listserv" is variously described as an email group in which the sender can send one email and it will reach a variety of people, or an automated mailing list that allows users to subscribe to particular topics and can be either managed automatically or by a human moderator. *Labate v. Rutland Hosp., Inc.*, 132 A.3d 1083, 1086 n.3 (Vt. 2015) (citations omitted).

[22] The Associate Judges were Judge Michelle Keller, now sitting as a Justice of our Supreme Court, and Judge (Ret.) Donna Dixon.

of the survey responses was attributable to any individual. Consequently, what this

Court said in *Sparks* still applies here:

> [T]he trustworthiness of the responses was in question, particularly given that the respondents were unavailable for cross-examination and their credentials were otherwise unverified. The trial court also expressed doubt as to whether such a survey could be reasonably relied upon under these circumstances – a sentiment with which we are inclined to agree.

*Sparks*, 2010 WL 4669011, at *8.

Just a few years after *Sparks*, in *Horn v. Ashland Hosp. Corporation*,

No. 2013-CA-001178-MR, 2014 WL 3722103 (Ky. App. Jul. 25, 2014), we

repeated this same reasoning. Like *Sparks*, *Horn* was a medical malpractice case.

*Horn*, too, is unpublished but entirely consistent with longstanding precedent, as

will be seen.

The plaintiff patient in *Horn* alleged the defendant physician, while

"perform[ing an] epidural lumbar steroid injection . . . was negligent for failing to

wear a surgical mask[.]" *Horn*, 2014 WL 3722103, at *1. The jury returned a

verdict for the physician and the patient appealed. One of the issues was whether

an anonymous survey was admissible.

The plaintiff had offered as proof "a survey of anonymous

respondents who mostly agreed that physicians should wear masks during such

procedures." *Id.* "[T]he trial court excluded the . . . survey evidence on the

grounds of timeliness and unreliability." *Id.* On review, this Court said: "Because we agree that the survey is unreliable and thus, inadmissible, we necessarily do not reach the timeliness issue." *Id.* at *2. We then showed our jurisprudential consistency on the issue of the inadmissibility of anonymous surveys by citing *Sparks* and quoting from the opinion, then summarizing that case as follows:

> As in *Sparks*, the survey herein *failed to identify who responded to the survey* . . . . As the trial court observed during the hearing, "One of my biggest concerns is . . . *they're not here to cross-examine*. . . . [W]e *don't even know who they are*, if they've answered truthfully."
>
> We are of the opinion that the survey herein, as in *Sparks*, was clearly hearsay under KRE 801(c). . . . [T]he survey results lacked sufficient reliability to be admissible.

*Id.* at *3 (emphasis added).

*Sparks* and *Horn* are part of a jurisprudential trajectory that began long ago. Those opinions made no mention of that jurisprudence but stayed true to its course. The trial court here did not.

The rule that words of an anonymous non-party should never be re-uttered in court for a factfinder to hear is a very old one in Kentucky. It predates our 1990 codification of the rules of evidence by well more than a century, as *Howard v. Commonwealth* makes clear. 12 S.W.2d 324 (Ky. 1928). *Howard* tells a tale of swift justice.

-58-

In 1928, "Mrs. Docia Combs, met her death from a pistol wound, and on the same day the appellant, Mrs. Nannie Howard, was indicted for her murder and brought to trial ten days later. A judgment sentencing her to imprisonment for life was the result." *Id.* at 325. The former Court of Appeals, our highest court at the time, found there were "a number of errors in the admission . . . of evidence" and the "most serious error [wa]s that in the testimony of Nora Sexton." *Id.* at 326.

Nora testified she was alerted to the women's altercation "by hearing 'a woman holler to Mrs. Howard and telling her not to shoot Docia.'" *Id.* When the trial court "pressed" her to give the exact words spoken by the unknown woman, "the witness said: 'Before I got out of bed, I heard them say not to shoot Mrs. Combs; they said Lord have mercy, Mrs. Howard, don't shoot her.'" *Id.*

The woman whom Nora quoted was never identified other than by the pronouns "them" and "they," and that was key. The Court held as follows:

> [W]hatever may be the rule elsewhere, this court is committed to the doctrine that such evidence is inadmissible. . . . This character of evidence is rejected as being hearsay, and the particular testimony admitted here bears not only that burden, but the vice of opinion evidence as well. The exclamation of this unknown woman carried the implication that she was of the opinion that the appellant was then and there about to shoot the deceased. It did not have the sanction of an oath, nor was opportunity given for cross-examination of this unidentified person.

-59-

*Id.*; *see also Riley v. Commonwealth*, 106 S.W.2d 85, 86 (Ky. 1937) (witness's

testimony of what she heard an anonymous person say was "a species of hearsay

and was incompetent"). *Howard* was decided on principles already well-

established. *Howard*, 12 S.W.2d at 327 (quoting *Bradshaw v. Commonwealth*, 73

Ky. (10 Bush) 576, 577, 1875 WL 6719, **2 (1874)). *Bradshaw*, however,

perfectly illustrates the foundational principles Professor Lawson discusses in the

opening section on hearsay in his treatise:

> [T]he predominant rationale for excluding hearsay [i]s the loss of an opportunity to cross-examine declarants in the presence of the decision makers. And, because it has guided authorities in the development of modern rules, it is this . . . rationale (loss of cross) that needs always to be considered when addressing issues concerning admissibility of out-of-court statements, especially when confronting the threshold question of whether a statement is hearsay or nonhearsay.

Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.00[1][b] (2023 ed.).

More modern iterations and applications of this rule can be found

firmly stated elsewhere in Kentucky case law. FCBE cites such a case, *Marchese*

*v. Aebersold*, 530 S.W.3d 441 (Ky. 2017).

*Marchese* is a domestic violence law opinion reversing a domestic

violence order because an "extrajudicial investigation . . . gave the [trial] judge

personal knowledge of a disputed evidentiary fact – Marchese's history of violent

behavior." *Id.* at 445. Applying KRS 26A.015(2), the Supreme Court held "the

judge's failure to recuse [after obtaining that personal knowledge] was structural error which indelibly tainted the remainder of the hearing . . . ." *Id.* at 446.

*Marchese* did not turn on an evidentiary issue; rather, the Court's holding that the trial court should have recused "resolves this appeal[.]" *Id.* For that reason, Mitchell argues the opinion is "easily distinguishable" and, therefore, inapposite. (Appellee's Br. 8.) But, after resolving the case in this manner, the Supreme Court remarkably went out of its way to add three (3) more pages to its analysis. *Marchese*, 530 S.W.3d at 446-49. Technically dicta, what those pages say about hearsay is directly applicable here and is nevertheless persuasive.

The Court added the following "for further guidance of the bench and bar [to] address the merits of the evidentiary issue presented." *Id.* at 446. It is set forth in a separate section the Court captioned "**B. Hearsay**" and states:

> The trial court's *use of evidence derived from an unidentified source also violated the traditional hearsay rules* codified in KRE 801, *et seq.* "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801. *The information* imparted to the trial judge about Marchese's assault conviction, which was then accepted into evidence, apparently as a judicially noticed fact, *was relevant to the issue before the trial court only if it were true.* The trial judge [factfinder in a bench trial] *relied upon an out-of-court statement from some undisclosed source to establish the truth of the matter asserted therein*; it is classic hearsay evidence. Without knowing of the source of the judge's information, we are unable to apply any of the exceptions to the hearsay rule.

*Id.* at 449 (emphasis added). Consistent with *Marchese*, none of the exceptions are applicable in the instant case. As in that case, the anonymous statement, "Ken is racist," is relevant only if the trial court believed it was offered for its truthfulness.

*Marchese* uses the words "unidentified" and "undisclosed" where, in addition to "unidentified," *Howard* used the word "unknown," and the parties herein say "anonymous." They all impart the same meaning. The focus is not on the speaker, but on disembodied words lacking any means to test their truthfulness. For nearly a century and a half, from *Bradshaw v. Commonwealth* to *Marchese*, this principle remains intact and unchanged – the words of nameless, unknown, unidentified, undisclosed, anonymous third parties must not reach the ears of jurors if those words are offered for their truth.

This core hearsay principle does not change beyond our borders. Federal case law dealing with this precise issue in discrimination cases is entirely consistent with all the aforementioned Kentucky jurisprudence, published and unpublished alike. Consider that case law starting with one of the most recent federal opinions, *Van Brunt-Piehler v. Absolute Software, Inc.*, 744 F. Supp. 3d 277 (W.D.N.Y. 2024).

In *Van Brunt-Piehler*, an employee sued her employer, Absolute Software, Inc., alleging gender discrimination and retaliation for complaining about it. As in the instant case, a jury verdict found in favor of the employee on

-62-

only one of the two causes of action.  *Id.* at 285.  Also as in the instant case, the employer moved for directed verdict and judgment notwithstanding the verdict.  *Id.* The post-verdict motion was granted in *Van Brunt-Piehler* as it should have been in this case.  *Id.* at 285-86.  The parallels also extend to the specific issue of the inadmissibility of an anonymous employee survey.

The plaintiff in *Van Brunt-Piehler* urged "the admission of . . . an anonymous employee comments survey completed by Absolute employees."  *Id.* at 290.  Before deciding the survey was inadmissible, Judge Wolford surveyed the federal jurisprudence.

> [T]he caselaw addressing anonymous surveys largely conclude that such documents are hearsay, a fact Plaintiff appears to ignore. "Courts have often excluded anonymous or voluntary surveys as irrelevant and unreliable." *Schreiber v. Fed. Express Corp.*, No. 09-CV-128-JHP-PJC, 2010 WL 1078463, at *3 (N.D. Okla. Mar. 18, 2010); *see also Lenius v. Deere & Co.*, No. C12-2063, 2015 WL 3505747, at *12 (N.D. Iowa Feb. 13, 2015) (addressing 2003 and 2005 surveys completed by Deere employees seeking feedback on the organization, and concluding that "[b]ecause the survey consists of anonymous responses, it is inadmissible hearsay"); *Schreiber*, 2010 WL 1078463, at *3 (anonymous surveys submitted to employees regarding the performance of supervisors and managers "are irrelevant and unreliable as there is no way to identify who submitted the information and allow the Defendant a chance to cross examine those persons regarding their opinions."); *Olle v. Columbia Univ.*, No. 02 Civ. 8552(RWS), 2004 WL 2580684, at *3 (S.D.N.Y. Nov. 15, 2004) (anonymous responses to survey were "inadmissible and irrelevant").

*Id.* at 291 (citations to docket omitted).

Just as helpful is the Court's discussion of the unavailability of any exception to the hearsay rule. That discussion is helpful here because, although Mitchell never argued a specific exception, the trial court alluded to a few. Like the judge in *Van Brunt-Piehler*, we find no basis for any exception that would allow testimony of anonymous out-of-court comments to establish the elements of a discrimination claim. Here is Judge Wolford's persuasive analysis:

> As to the various hearsay exceptions listed by Plaintiff, none of them apply here. Plaintiff contends that the anonymous survey is an admission by a party opponent under Rule 801(d)(2). Plaintiff further argues that the anonymous survey could be admitted under Rule 803(1) as a present sense impression, under Rule 803(3) as reflecting Defendants' then-existing state of mind, and as a business record under Rule 803(6). As to Plaintiff's argument that the anonymous survey responses qualify as admissions of a party opponent under Rule 801(d)(2), the survey company – not Absolute [FCBE] employees – wrote the statements in the survey responses and paraphrased the employee comments. . . . Accordingly, the anonymous survey responses are not admissions by Absolute [FCBE]. *See also United States v. Holmes*, No. 5:18-cr-00258-EJD-1, 2021 WL 2044470, at *57 (N.D. Cal. May 22, 2021) ("The Government does not cite, and this Court is unaware of, any case supporting the admission of the statements of hundreds of employees to a corporate CEO under Rule 801(d)(2)(D).").
>
> . . . .
>
> [A]s to Rule 803(3), which governs the requirements for a then-existing state of mind, that Rule requires the offering party to demonstrate "the declarant's then-existing state of

-64-

mind (such as motive, intent, or plan)." Fed. R. Civ. P. 803(3). Plaintiff states that the "survey reflected the defendants' then-existing state of mind because the defendants used it to inform their knowledge of 'what the main issues are in the company,' 'understanding of the level of engagement within the company,' and to rectify the major issues raised in the survey." However, Plaintiff has failed to establish that the anonymous survey responses reflect an existing motive, intent, or plan, versus facts recalled or believed, which are excluded from the exception. *See* Fed. R. Evid. 803(3) (providing that the rule does not apply to "a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will"). Indeed, surveys are often admitted in cases involving trademark infringement because they are asking the individual completing the survey to indicate their real-time impressions of various trademarks – but Plaintiff has made no such showing with respect to the surveys here. Likewise, Plaintiff never tried to show that the anonymous employee surveys qualified as business records under Rule 803(6), including that they were kept in the regular course of business and that making the record was a regular practice of that activity.

*Id.* at 291-92 (citations to docket omitted).

There is an abundance of federal case law that is consistent with *Van Brunt-Piehler*, some of which that opinion cites and more that it does not. Here are some of those readily discoverable decisions. *Estate of D.B. by Briggs v. Thousand Islands Central School District*, 327 F. Supp. 3d 477, 531 (N.D.N.Y. 2018) ("While Plaintiff cites to surveys conducted in the District to support its [discrimination] claims, these surveys are unsworn, unsigned, anonymous hearsay and thus are inadmissible."); *Olle v. Columbia University*, 136 F. App'x 383, 384

(2d Cir. 2005) (plaintiff "argue[d] that an anonymous survey of prior fellows demonstrates pervasive bias"; court held, "This survey is clearly inadmissible hearsay under the definition of Federal Rule of Evidence 801."); *Lenius v. Deere & Co.*, No. C12-2063, 2015 WL 3505747, at *1 (N.D. Iowa Feb. 13, 2015).[23] *See also Alkhatib v. Steadman*, No. CIV.A. 10-00342-KD-C, 2011 WL 5553775, at *3, *8 (S.D. Ala. Nov. 15, 2011) (anonymous "2009/2010 Faculty Survey Results – Comments on Deans"; the Court held "the survey responses are not adequately trustworthy to warrant their admission at trial"); *Larmanger v. Kaiser Found. Health Plan of the Northwest*, 895 F. Supp. 2d 1033, 1052 (D. Or. 2012), *aff'd*, 585 F. App'x 578 (9th Cir. 2014) ("survey results consist of out-of-court statements by unidentified individuals, are inadmissible hearsay").

The trial court abused its discretion when it repeatedly ruled anonymous comments on the survey were admissible. It abused its discretion again when it allowed testimony repeating the hearsay simply because the witness personally heard it, notwithstanding it certainly was offered for its truth.

---

[23] In *Lenius*, an employer, Deere & Company, surveyed its employees "seeking feedback regarding the organization." 2015 WL 3505747, at *12. Like the CMI survey, the employees were asked to agree or disagree with statements such as "whether the organization 'inspires the best in me,' how they would rate 'morale,'" etc. *Id.* Like the CMI survey, it allowed "'comments, suggestions or ideas' submitted anonymously by the employees responding." *Id.* The Court held that "[b]ecause the survey consists of anonymous responses, it is inadmissible hearsay . . . [and] because the evidence would confuse the issues and mislead the jury," the Court also held it "inadmissible under Rule 403." *Id.*

There is merit as well in FCBE's argument that the trial court misinterpreted the rule of completeness as codified in CR 32.01 and KRE 106. When FCBE invoked the right under CR 32.01 to compel Mitchell's counsel to *contemporaneously* introduce another part of a deposition to complement the part he just introduced as KRE 106 requires, the trial court denied that right, saying FCBE's counsel could introduce it herself on cross-examination. Although interruption of a witness's examination is a "departure from the norm[,]" KRE 106 requires it because "a correction of a distortion or misimpression might sometimes be ineffective if delayed until cross-examination or rebuttal, as explained by authorities on the Federal Rules:

> The underlying notion is that sometimes waiting until later to offer additional context is just not good enough, and contextual data is more easily understood if it is provided in the first instance.

Lawson § 6.05[1][c] (quoting 1 Mueller & Kirkpatrick, Federal Evidence 305(3d ed. 2007).

Although FCBE's other arguments are not lacking in merit, there is little to learn from discussing them and we have found more than sufficient reason for reversing the jury verdict without doing so.

## CONCLUSION

Because Mitchell failed to present evidence to establish all four elements of his race discrimination claim, the jury verdict based in part on the trial

court's allowance of inadmissible evidence must be reversed and this case remanded to the Fayette Circuit Court with instructions to enter a Judgment Notwithstanding the Verdict.

THOMPSON, CHIEF JUDGE, CONCURS.

CALDWELL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

CALDWELL, DISSENTING:  I would affirm.  I would review many of the issues raised by FCBE solely for palpable error since FCBE fails to provide sufficiently specific citations to the record for this Court to easily see where these issues were raised to the trial court and thus preserved for our review.  RAP 31(E)(3)-(4); RAP 32(A)(4).  *See also Curty v. Norton Healthcare, Inc.*, 561 S.W.3d 374, 377 (Ky. App. 2018);[24] *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021).  It is not our responsibility to scour the record to see if arguments for reversal have been properly preserved by being previously raised to the trial court.  *Koester v. Koester*, 569 S.W.3d 412, 415 (Ky. App. 2019).  *See also J.P.T. v. Cabinet for Health and Family Services*, 689 S.W.3d 149, 152-53 (Ky. App. 2024) (stating: "When counsel fail to narrow focus to specific parts of a record, . . . they unnecessarily tax already limited judicial resources" and suggesting that appellate

---

[24] *See also Bell v. Commonwealth*, No. 2022-SC-0551-MR, 2024 WL 1146493, at *2 n.4 (Ky. Mar. 14, 2024) (unpublished).  While this unpublished case is not binding authority, RAP 41(A), our Supreme Court's reasoning is certainly persuasive.

courts' overlooking violations of appellate briefing rules without imposing consequences results in unfairness and temptations for others to ignore such rules).

That being said, there are a few issues – mostly evidentiary ones – which FCBE demonstrated were raised to the trial court and thus preserved for our review. However, I discern no abuse of discretion in the trial court's resolution of these evidentiary issues.

This is especially true since the jury was instructed to resolve the racial discrimination claim as a hostile work environment claim – although the parties' briefs inexplicably fail to discuss this fact. I note FCBE did not raise any alleged error in the jury instructions in its red appellant brief – in other words, it did not argue the trial court erred in instructing the jury on racially hostile work environment. And despite the discussion in the majority Opinion regarding the case not being prosecuted as a hostile work environment case, it would appear everyone forgot to let the jury know this. And even more significant, it was the Appellant's tendered jury instruction regarding race discrimination that was presented to the jury. It is not our responsibility to make arguments for reversal for the appellant. *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005). And if the trial court's judgment can be affirmed for any reason supported by the record – even for reasons not raised by the parties in this appeal – we are

obligated to affirm. *Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 496 (Ky. 2014).

Based on the record before us, the jury found the necessary elements for a hostile work environment claim.[25]  And hostile work environment claims simply call for a different analysis than other types of discrimination claims.  *See generally Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814 (Ky. 1992); *Lumpkins ex rel. Lumpkins v. City of Louisville*, 157 S.W.3d 601 (Ky. 2005); *Gray v. Kenton Cnty.*, 467 S.W.3d 801, 805 (Ky. App. 2014).

For example, certain verbal statements – even some statements which do not directly concern the plaintiff or refer to the protected class or are not made in his/her presence – are much more relevant to determining whether a hostile work environment existed than to determining whether an adverse employment action occurred.  *See generally Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999); *Berryman v. SuperValu Holdings*, 669 F.3d 714 (6th Cir. 2012); *Kirkwood v. Courier-Journal*, 858 S.W.2d 194 (Ky. App. 1993).

---

[25] Unlike the jury instruction on disability discrimination, the jury instruction on racial discrimination did not mention the decision not to demote Mitchell.  Instead, it asked the jury to find whether Mitchell proved by a preponderance of the evidence:  1) that Mitchell was subjected to racial epithets or "disproportionate unpleasant work assignments" due to his race, 2) that such conduct was so severe or repetitive that it unduly interfered with Mitchell's work performance or created a hostile work environment for a reasonable person of Mitchell's race and 3) that it caused psychological injury to Mitchell.  (TR, p. 582.)

Given the fact the jury resolved the racial discrimination claim as a hostile work environment claim, I discern no reversible error in the trial court's resolution of evidentiary issues here.

Moreover, I further discern no other reversible error in the trial court's handling of issues about impeaching a witness with deposition testimony nor in its handling of juror questions. And though I disapprove of the trial court's telling the jury that one juror question would not be submitted to a witness due to FCBE's objection, this does not rise to the level of reversible error in my view. The jury was certainly aware that both parties made objections at various times based on my review of the record.

In sum, unlike the majority, I am not convinced that FCBE properly demonstrated that all the issues it raised for reversing the judgment were properly preserved for review or resulted in reversible error. Thus, I would affirm the trial court's judgment on the jury verdict.


BRIEFS FOR APPELLANT:

John G. McNeill
Elizabeth A. Deener
Lexington, Kentucky

BRIEF FOR APPELLEE:

Edward E. Dove
Lexington, Kentucky